**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF FEDERAL
AIKEN DIVISION**

| | | |
|---|---|---|
| **Alacia C. Quinton as PR for the Estate of April Lynn Quinton,** | ) | C/A No. <u>**1:10-2187-JMC**</u> |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **Toyota Motor Corporation, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>PLAINTIFF'S OMNIBUS MOTIONS IN LIMINE</u>

Plaintiff, by the undersigned attorney, moves the Court to order that counsel for Defendants, and through such counsel, any and all defense witnesses, be instructed by an appropriate order of this Court to refrain from making any mention on interrogation, directly or indirectly, in any manner whatsoever, either in opening statement, questioning of witnesses, closing statements or otherwise, concerning any of the matters set forth herein. Plaintiff states that the matters set out below would be inadmissible as evidence for any purposes on proper and timely objection in that they have no bearing on the issues involved in this case or the rights of the parties to this action. Permitting interrogation of witnesses, statements or comments to the jurors or prospective jurors, or offers of evidence concerning these matters would unduly prejudice the Plaintiff and sustaining objections to such questions, comments, or offers would not cure the effects of such prejudice, but would rather reinforce the impact of such prejudicial matters on the jurors.

The following matters are irrelevant, immaterial, and would not be admissible as evidence for any purpose in this cause. In support thereof, the Plaintiff shows the Court as follows:

**1.    Motion To Exclude Any And All Of Plaintiff's Decedent's Medical Records Not Related To Plaintiff's Decedent's Care And Treatment As A Result Of This Accident And Any Testimony Related Thereto.**

Defendants have obtained and listed on their exhibit list multiple medical records of Plaintiff's decedent which are in no way related to the accident made the basis of this suit. Among others, Defendants have listed decedent's OB-GYN records as an exhibit they may offer at trial. Defendants also designated deposition testimony of decedent's mother which deals with medical conditions of a personal and sensitive nature and which are wholly irrelevant to any issues in this case. Several of these records were produced in direct violation of this Court's HIPPA Order (Doc. 48) and contain information specifically protected from disclosure. These records and testimony have no bearing on this case and should be excluded pursuant to Rules 401, 402, and 403 of the *Federal Rules of Evidence.*

**Granted _____**        **Denied _____**

2.    **Motion To Exclude All Testimony, Argument, Documents, Or The Like Regarding Accident Causation Or Accident Fault, Including But Not Limited To, Any Allegation That April Quinton Was Exceeding The Speed Limit At The Initiation Of The Accident Or "Overcorrected".**

Plaintiff anticipates that Defendants may attempt to introduce evidence or make arguments or innuendos that April Quinton caused this accident and that her speeding and steering may have played a role in the cause of the accident, and therefore attempt to assign fault to Ms. Quinton in this case. Any testimony, argument or evidence of this nature should be excluded pursuant to *Federal Rules of Evidence* 401, 402 and 403 as irrelevant, immaterial, and highly prejudicial.

This is a crashworthiness case. Plaintiff alleges that the subject Toyota Camry's air bag was defective, and unreasonably dangerous, by failing to deploy in a foreseeable rollover environment. Plaintiff does not allege the defect in the air bag caused the accident. Instead, Plaintiff alleges that the defect caused an "enhanced injury" when the accident occurred, resulting in Ms. Quinton's death.

The crashworthiness doctrine applies if a defect, not causally connected to the collision, results in injuries greater than those that would have resulted were there no defect. "Under the crashworthiness doctrine, liability is imposed not for the defects that cause collisions but for defects that cause injuries after collisions occur." *Jimenez v. DaimlerChrysler Corp.,* 269 F.3d 439, 452 (4th Cir. 2001)(citing *Mickle v. Blackmon,* 252 S.C. 202, 166 S.E.2d 173, 185-186 (1969)). "The issue for purposes of a crashworthiness case, therefore, is enhancement of injuries, not the precipitating cause of the collision." *Jimenez v. Chrysler Corp.,* 74 F.Supp.2d 548, 565 (D.S.C. 1999), *reversed in part on other grounds,* 269 F.3d 439 (2001). "Accordingly, evidence about the cause of the original accident is not relevant." *Jimenez,* 269 F.3d at 452. "[I]n light of the crashworthiness

principle, the cause of the original accident [is] not relevant to proving a claim for enhanced injury." *Id.* at 453. April Quinton was killed as a result of the defective air bag, i.e. the Camry was not crashworthy. She would not have died in this accident but for the defective air bag. Whether April Quinton was speeding or not at the time of the accident is not relevant in a crashworthiness case. As a result, any evidence, argument or innuendo about her speed or her alleged fault in causing the accident should be excluded pursuant to Rule 401 and 402 of the *Federal Rules of Evidence*.

Further, such evidence should be excluded as its probative value is substantially outweighed by the dangers of unfair prejudice, confusion of the issues and misleading to the jury. *Federal Rules of Evidence* Rule 403. Use of this type of evidence would be highly misleading and confusing to the jury since the determination of accident fault/liability has nothing to do with the requirements for finding an automobile not crashworthy and thus defective.

The fact is, no one knows why this vehicle went out of control. Although the investigating officer surmised Ms. Quinton was driving too fast for the conditions and overcorrected her steering, he is not qualified as an expert in accident reconstruction or precision driving nor did he do any investigation into other potential causes. Had he looked at other potential causes he would have discovered this vehicle has two safety related defect recalls due to conditions which result in the accelerator pedal becoming stuck and the vehicle going out of control and crashing. Evidence of recalls related to conditions that could result in a crash would be admissible to rebut Defendant's claims that Plaintiff's decedent was at fault in causing this accident.

Because Plaintiff's role, as it relates to the cause of this accident, is irrelevant and immaterial, lacks probative value, and its potential for prejudice and misleading the jury

substantially outweighs any possible probative value, the Court should prevent the Defendants and their counsel from mentioning, inferring or alluding to this evidence or attempting to assign fault to April Quinton in this case.

**Granted _____**          **Denied _____**

3.     **Motion To Exclude Any Reference To Or Evidence, Testimony, Or Argument Concerning Statements That The Number Of ¼ Rolls Is An Indicator Of The Severity Of The Accident.**

The Plaintiff objects to any reference to or evidence, testimony, or argument that would state or imply that the number of ¼ rolls a vehicle incurs during an accident is an indicator of the severity of the accident.  Such evidence should be excluded pursuant to the *Federal Rules of Evidence* Rule 401 and 402 as irrelevant and immaterial.  Further, such evidence and/or testimony is improper under Rule 403 because its probative value is substantially outweighed by the danger of unfair prejudice, confusing of the issues or misleading the jury.  Plaintiff anticipates that the defense and their experts will describe this rollover accident as being a "severe" event because the vehicle rolled more than once.  However, this argument is inaccurate and misleading and is intentionally designed to confuse the jury.  In reality, the actual rollover event is the most benign and non-severe type of accident mode.  Engineers typically define "severity" as the rate at which energy is lost.  The rate of energy dissipation is based on multiple vehicle characteristics, including weight and speed.  For example, a vehicle traveling at 30 mph and striking a rigid frontal barrier will experience an abrupt change in velocity (going from 30 mph to 0 mph) in roughly 2/10 of a second in approximately 2 ft.  This can be defined as a "severe" event because the change in velocity occurs in a very short period of time.  However, if that same vehicle is traveling at 30 mph and the driver gently applies the brakes in order to slow to a stop in a distance of 70 ft., this would not be defined as a "severe" event because the change in velocity occurs over an extended period of time.  While the amount of energy dissipated is the same in these two scenarios, the rate of energy dissipation, or the "severity," is very different.

In a rollover, the rate at which energy is lost is very similar to the scenario where the brakes were applied.  A vehicle involved in a rollover may travel hundreds of feet over several

seconds before it comes to rest.  Again, this would not be defined as a "severe" event because the change of velocity occurs over an extended period of time.  If the occupant is adequately restrained, the vehicle does not strike an object and the occupant is not ejected or partially ejected, the occupant experiences an accident that is only slightly more violent than an amusement park ride.  The forces generated by most rollovers are well within human tolerance if the occupant is properly restrained and the vehicle does not experience a sudden change in velocity.

Plaintiff anticipates that Defendants' experts will attempt to opine, through the use of statistical evidence, that the risk of fatal and serious injury is essentially the same regardless of the design of the vehicle involved, the roof structure, airbag, padding, or the type of seatbelts and that the number of rolls in an accident is indicative of the severity.  However, Defendants' experts' are not statisticians, are not qualified to evaluate, analyze or opine on any form of statistical data, and the charts and statistical evidence that they seek to discuss are inadmissible because they lack the requisite substantial similarity required.  Thus, Defendants' experts can provide no connection, statistically or otherwise, between the number of rolls in an accident and the severity of the injuries incurred.

a.    **The Data Relied Upon Fails The Substantial Similarity Test.**

To be probative of a design or manufacturing defect, the evidence must show that the similar accidents occurred under substantially similar circumstances and involved substantially similar components. The anticipated testimony is based upon statistics of other accidents, none of which can be shown to meet the "substantial similarity" test for admissibility.  In a products liability case, the rule of "substantial similarity" prohibits the admission into evidence of other occurrences unless the proponent first shows that there is a substantial similarity between the

other occurrences and the claim at issue in the litigation.  It is well established that evidence of other incidents must be "similar" in all respects to be admissible.  Cooper Tire & Rubber Co. v. Crosby, 273 Ga. 454, 543 S.E.2d 21 (2001).  "The showing of substantial similarity must include a showing of similarity as to causation." [FN omitted] Without such showing, the evidence is irrelevant as a matter of law."  Stovall v. DaimlerChrysler Motors Corp., 270 Ga.App. 791, 793, 608 S.E.2d 245, 247 (2004).  This is true even where the evidence purports to be "statistical."  Id. at 794 (no error in excluding statistical data where proponent failed to show any similarity among the complaints represented by the data and Stovall's alleged defect); Cooper, supra (exclusion of adjustment statistics where there was no showing of substantial similarity).  *See, also,* the unpublished decision in Hockensmith v. Ford Motor Company, No, 03-13729, in which the Eleventh Circuit Court of Appeals held that substantial similarity with the Hockensmith accident was required for admission of William Wecker's statistical evidence, where that evidence was offered to show that the Ford Explorer does not have an unreasonable propensity to roll over in comparison to other compact utility vehicles.  Likewise, in  Baker v. Deere and Co., 60 F.3d 158 (3rd Cir. 1995), a lack of showing of substantial similarity was the basis for preventing an expert from using statistical testimony to support his argument.

This application of the "substantial similarity doctrine" was also applied by the 5th Circuit Court of Appeals in Battistella v. DaimlerChrysler Motors, Co., LLC,  2004 WL 1336444 E.D.La.,2004., Jun 14, 2004, (5th Cir. 2004) (N.S.O.P.).  The Battistella Court stated, in excluding Dr. Baxley's testimony:

> Dr. Baxley used consumer complaints and similar information about other accidents to form his opinions about Plaintiff's accident and injuries.  (*See* National Highway Transportation and Safety Administration (NHTSA) consumer complaints involving 2001, 1999, 1998, 1995 and 1994 Dodge Ram trucks and the failure of air bags to deploy during a frontal collision ….).  However, while evidence of other incidents may have some probative value if substantial

similarity to the subject accident is established, Dr. Baxley lacks sufficient information concerning any of the incidents upon which he relies to satisfy this requirement. (Baxley Dep. at 34-36, 75, 80, 83-84, 87). And although Dr. Baxley claims to have based his opinion on other cases in which air bags failed to deploy and the driver sustained injuries more serious than Plaintiff, he did not explain the relevancy of these cases. (*Id.* at 38- 41).

The United States Court of Appeals Circuit, in Jaramillo v. Ford Motor Company, 116 Fed. Appx. 76 (2004)(N.S.O.P.), held, in part:

> To be relevant, Ford's comparative accident statistics must be based on accidents that occurred under circumstances similar to the Jaramillos' accident, *i.e.* a rollover on smooth, dry pavement. '[E]very court of appeals agrees that when a Plaintiff attempts to introduce evidence of other accidents as direct proof of a design defect, the evidence is admissible only if the proponent demonstrates that the accidents occurred under circumstances substantially similar to those at issue in the case at bar.' Barker v. Deere and Co., 60 F.3d 158, 162 (3d Cir.1995). While this substantial-similarity doctrine has normally been applied to preclude other-accident evidence offered by Plaintiffs, we have explained that the doctrine 'rests on the concern that evidence of dissimilar accidents lacks the relevance required for admissibility under Federal Rules of Evidence 401 and 402.' Cooper v. Firestone Tire and Rubber Co., 945 F.2d 1103, 1105 (9th Cir.1991). Because this underlying concern is not limited to comparative accident statistics offered by Plaintiffs, defendants like Ford that attempt to compare their products to others to show the relative safety of their designs or a lack of notice must show that their comparisons are based on accidents that are similar to the Plaintiff's accident.

(Emphasis added.)

Clearly, the strict scrutiny of the courts that applies each time evidence of other individual actions are offered should not be abandoned simply because the "other accidents or injuries" appear in greater number as part of a statistical compilation. In fact, some courts have recognized an even greater need to scrutinize evidence of other accidents and injuries when they are offered in the hodgepodge form of statistics. The following exchange illustrates the inherent confusion and prejudice of statistical risk analysis. This exchange took place between defense counsel and the Honorable Barbara J. Rothstein, Federal District Court, Western District of

Washington, on defense counsel's claim that statistical evidence is exempt from the substantial

similarity rule:

> COUNSEL:    Statistical data is a completely different methodology than what the Plaintiff's burden is in having to show evidence of similarity for defect . . . .  The comparative analysis that Doctor McCarthy is going to be utilizing, it involves taking the risk data from the pool of all available information and putting that under consideration and determine whether or not a policy or a product is or is not unreasonably dangerous.
>
> It is the most scientific tool used today by all government agencies. NHTSA uses it, the Environmental Protection Agency uses it. They all use statistical data to determine safety.
>
> COURT:    Counsel, I love it.  I've been waiting for somebody to actually make that argument, and I hope you didn't mean to make that argument you just made.  Of course it matters what the statistics are based on, otherwise statistics can say anything, and that's the problem we have with statistics, especially in a court of law.
>
> COUNSEL:    Yes, Your Honor.
>
> COURT:    The statistics must be based on a relevant foundation and that foundation must conform to the case we have before us.
>
> COUNSEL:    Yes, Your Honor.
>
> COURT:    So it will be a matter of laying an adequate foundation.  You are going to have to convince the Court that statistics are based on sufficiently similar accidents and incidents before they can come in.  Just saying that, well, there are just statistics, therefore we are only dealing with statistics and we know that they are scientific, uh-uh, that doesn't get you there.  Out of the presence of the jury I'm going to have to be persuaded that his statistics are based on similar enough accidents so that they warrant coming in. If they are not...they're not coming in...But statistics alone, the fact that somebody had done a sampling of different situations doesn't get you there.

Kenneally v. Suzuki Motor Corp., Case No. C93-0867R (W.D. Wash.).

### b.    Inadmissible Hearsay

Compounding all of the reliability problems noted above is the fact that the federal and state databases are made up of layer upon layer of inadmissible hearsay, which includes the subjective interpretation of various individuals far removed from this case.  The process starts with *some* type of record – FARS uses twenty or so *different* types of records to gather information, from hospital records and death certificates to accident reports.  Those records were created by others, often based on statements from people a step or more removed from the author of the records.  Someone on behalf of FARS then deciphers the information from the various records and inputs it into a computer through a coding process.  Any minor notation, reporting, or coding error anywhere along the hearsay chain would change the data points for the incident, as would any error by Defendant's experts in gathering, searching, evaluating, compiling, and combining the incident numbers.

Moreover, the underlying support for Defendant's statistics is police reports. Information contained within police reports is hearsay unless it meets a statutory exception.  In the case of the accident reports contained within the databases used by Defendant, there is no way to determine how much or what portions of the records amount to pure hearsay.  The databases include all types of vehicles and accidents, are encoded into the database by persons who have no personal knowledge of the events, use very broad codes, and include a wide variety of fact patterns and varied methodology.  Defendant's opinions are, therefore, based on hearsay, incomplete and unreliable data and are, therefore, inadmissible.

Further, had Ms. Quinton's airbag not system functioned properly, she would not have sustained the injuries in this accident which resulted in her death.  In other words, the number of rolls is irrelevant because Ms. Quinton survives this accident if she was adequately protected

from partial ejection.  Thus, any argument and/or evidence that the number of rolls in an accident is indicative of the severity of the accident is irrelevant, immaterial, misleading, and has no probative value on the issues of this case.  As a result, any evidence thereof or reference thereto should be excluded under *Federal Rules of Evidence* Rule 401, 402 and 403.

**Granted _____**          **Denied _____**

**4.   Motion To Exclude Any Statements Or Evidence Implying That "To Find The Camry Defective In This Case Would Be To Find Virtually All Passenger Cars Defective."**

This type of statement places an improper burden of proof on Plaintiff, suggesting to the jury that Plaintiff must prove that virtually <u>all</u> passenger cars are defective in order to find that April Quinton's Camry is defective.  The law does not place this kind of burden on Plaintiff, and Toyota should not be allowed to suggest such.  Moreover, these statements are nothing more than defense counsel's opinion of what Plaintiff "wants" or is trying to do.

It is anticipated that Defendant's will attempt to argue to the jury that if they find the Camry defective by design for its failure to include a rollover activated airbag, then the jury would be condemning a whole class of vehicles unfairly. This places an unfair and heavy burden on the Plaintiff.  It is not appropriate for the jury to have the impression that finding a defect in the Camry would be equivalent to finding all passenger cars defective.  This case is about the 2009 Toyota Camry and not every other passenger car on the planet.  To allow Defendant's to argue that Plaintiff's expert's opinions or theory in this case would condemn a whole class of vehicles is unsupported by evidence, irrelevant, and unfairly prejudicial.  It also brings in extraneous and irrelevant considerations about other vehicles not the subject of this lawsuit.

**Granted _____          Denied _____**

5. **Motion To Exclude Testimony Or Evidence Implying That Statistically The Camry Has A Great Overall Safety Record Or That The Camry Has A "Five-Star" Safety Rating.**

The "overall safety" of the Camry is irrelevant. The only issues in this case relate to airbag design and performance in the Toyota Camry. That the Camry performs well in frontal impacts, or has good door latches is entirely irrelevant. However, Toyota attempts to interject this overall safety argument into the case in order to bolster the appearance that the Camry is generally "safe".

Plaintiff anticipates that Defendants may attempt to introduce evidence that the 2009 Camry received a "five-star" safety rating. At the outset, it should be noted that the government's five-star rating system was changed for vehicles, beginning with the 2011 model year. The safercar.gov website cautions about comparing safety rating for various vehicle model years. "Safety ratings for 1990-2010 vehicles should not be compared to ratings for 2011 and newer models since NHTSA introduced more stringent tests and new 5-Star Safety Ratings starting with 2011 models." (*Safercar.gov*)[1]

In the frequently asked questions section the following appears:

FAQ 11: Do the changes in the new safety ratings mean vehicles that previously received 4- or 5-star ratings may get lower ratings even if no changes have been made to the vehicle?

Answer: Yes, some vehicle's star ratings that were rated higher under the older Safety Ratings system may be lower under the new five-star safety rating system….

---

1 Safercar.gov, 1990-2010 Vehicle Ratings, http://www.safercar.gov/Vehicle+Shoppers/5-Star+Safety+Ratings/1990-2010+Vehicles (last visited May 14, 2013).

(Safercar.gov).[2] Allowing Toyota to introduce evidence of the Camry's safety rating would only serve to confuse and mislead the jury.

Evidence that the Camry received a five-star safety rating is not relevant to any of the crashworthiness issues in this case. This case arises out of a single vehicle rollover accident. Plaintiff's crashworthiness claims are based upon the failure of the vehicle to provide occupant protection in this rollover accident and involve the performance of the airbag system. The relevant inquiry in terms of Plaintiff's defect claims is how well this vehicle protects its occupants in rollover accidents.

Evidence that the Camry received a five-star rating is exceedingly misleading in this case. First, it makes it appear as if the government somehow approved the design of this vehicle, which it did not. Second, it makes it appear as if the Camry provides five-star crash protection in any type of collision, which it does not. Given the power of a perceived government endorsement and the impression created by the phrase, "Safety Rating", presenting this evidence to the jury creates a substantial risk that a jury would improperly infer from the rating that the federal government had given the Camry its highest rating in terms of providing protection in this specific crash. Because this inference would be clearly wrong and exceedingly prejudicial, evidence of the Camry's safety rating should be excluded.

**Granted _____**          **Denied _____**

---

2  Safercar.gov, 1990-2010, Vehicle Ratings, http://www.safercar.gov/staticfiles/toolkit/pdf).

**6.      Motion To Exclude Any Testimony Or Evidence Implying That Toyota Camrys Are "Most Popular," "Best Sellers," Or Other Comments Regarding Sales And Marketing.**

Whether the Toyota Camry is "popular" or a "best seller" is irrelevant to whether it is defective and unreasonably dangerous.  These characterizations are nothing more than the subjective opinion(s) of unnamed persons that are offered without evidentiary support.  As such, they constitute inadmissible hearsay and result in unfair prejudice to Plaintiff.

**Granted _____          Denied _____**

**7.    Motion To Exclude All Testimony, Evidence, References To Or Argument Concerning Collateral Payments Received By The Plaintiff.**

Plaintiff anticipates that Defendants will attempt to introduce evidence and testimony regarding collateral sources of payment received by the Plaintiff. Such evidence or comment is irrelevant, has the potential for prejudice and misleading the jury, and its prejudicial effect substantially outweighs its probative value. *Federal Rules of Evidence* 401, 402, and 403. Evidence is properly excluded "if its probative value is substantially outweighed by the danger of unfair prejudice . . . or misleading the jury . . ." *Federal Rules of Evidence* 403. South Carolina has adopted the collateral source rule. "The collateral source rule provides 'that compensation received by an injured party from a source wholly independent of the wrongdoer will not reduce the damages owed by the wrongdoer." *Covington v. George*, 597 S.E.2d 142, 144, 359 S.C. 100, 103 (2004). "A tortfeasor cannot take advantage of a contract between an injured party and a third person, no matter whether the source of the funds received is an insurance company, an employer, a family member, or other source." *Covington, supra.* Accordingly, the Court should prevent the Defendants and their counsel from mentioning, inferring or alluding to any collateral payments received by the Plaintiff in this case. This motion would include any payments received by medical providers or life insurance companies.

**Granted _____          Denied _____**

**8.    Motion To Exclude Any Reference To Or Evidence, Testimony, Or Argument Related To Whether The Subject Toyota Camry Met Or Exceeded Unrelated Federal Motor Vehicle Safety Standards.**

Plaintiff requests the Court to exclude any evidence or testimony that Defendant Toyota, in manufacturing the subject vehicle, complied with the Federal Motor Vehicle Safety Standards ("FMVSS") as this evidence is not relevant, its prejudicial value significantly outweighs its probative value, and introduction of this evidence could result in reversible error.   It is anticipated that Defendant Toyota will attempt to introduce evidence to tell the jury that the subject vehicle complies with all FMVSS and that this evidence will prove that the subject vehicle was properly manufactured and therefore not defective and unreasonably dangerous.

Toyota should be precluded from making any such argument.  Any alleged compliance with the FMVSS is irrelevant, the prejudicial effect would far outweigh any probative value, and would likely cause juror confusion and could result in reversible error.  The FMVSS are merely *minimum standards* which a vehicle must meet or it cannot be sold.  The FMVSSs do not absolve a manufacturer of liability.

**a.    FMVSSs are minimum standards**

In 1966, Congress passed the Federal National Traffic and Motor Vehicle Safety Act (15 U.S.C. §§1381-1431) as a legislative response to mounting highway deaths and injuries.  The FMVSSs were promulgated under the authority of the Act.  Compliance with the FMVSSs does not mean a vehicle is not defective.  To the contrary, a vehicle can comply with the FMVSSs and still be defective and unreasonably dangerous. Plaintiff will introduce expert testimony that establishes this fact.

Additionally, NHTSA, through its Chief Counsel, has advised litigation attorneys that a motor vehicle manufacturer's compliance with the FMVSS 1) does not mean that a vehicle

design is safe, 2) does not preempt common law causes of action, and 3) is not an affirmative defense in a products liability action.

In the Act, Congress defined "safety standard" to mean "a ***minimum*** standard for motor vehicle or motor vehicle equipment performance."  49 U.S.C. §30102(a)(9) (emphasis added). Furthermore, Congress expressly cautioned that "[c]ompliance with a motor vehicle safety standard prescribed under this chapter ***does not exempt*** a person from liability at common law." 49 U.S.C. §30103(e) (Emphasis added).

The following excerpts from the Congressional Record illustrate that Congress' intent in passing the Act and authorizing the Safety Standards was to create minimal performance floors – and that compliance with these minimal standards was in no way to impact common law tort liability for defective products:

1.   "[T]he Federal minimum safety standard need not be interpreted as restricting State common law standards of care.  Compliance with such standards would thus not necessarily shield any person from product liability at common law." S.Rep.No. 1301, 89th Cong., 2nd Session (1966).

2.   Congress "intended, and this subsection [30103(e)] specifically establishes, that compliance with safety standards is not to be a defense or otherwise to affect the rights of parties under common law, particularly those related to warranty, contract and tort liability."  H.R.Rep.No. 1776, 89th Cong., 2nd Session (1966).

3.   "[C]ompliance with Federal standards does not exempt any person from common law liability."  112 Cong.Rec. 21,487 (1966) (Remark of Senator Magnusson).

4.   "[The Act leaves intact] every single common law remedy that exists against a manufacturer for the benefit of a motor vehicle purchaser.  This means that all of the warranties and all of the other devices of common law which are afToyotaed to the purchaser, remain in the buyer, and they can be exercised against the manufacturer."   112 Cong.Rec. 19,663 (1966) (Remarks of Representative Dingell).

Since Congress has expressed its intent that **compliance** with federal regulations "is not to be a defense *or otherwise affect the rights of parties under common law*," then alleged compliance with the Federal Motor Vehicle Safety Standards is irrelevant and inadmissible.

These excerpts from the Congressional Record which illustrate that Congress' intent in passing the Act and authorizing the FMVSSs was to create **<u>minimal</u>** performance floors – and that compliance with these minimal standards was in no way to impact common law tort liability for defective products.  Since Congress has expressed its intent that compliance with federal regulations "is not to be a defense or otherwise affect the rights of parties under common law," then alleged compliance with the FMVSSs is irrelevant and inadmissible.

### b.    Compliance With Federal Standards Is Irrelevant

Although Toyota may claim that compliance with federal standards is dispositive in products liability cases, these claims have consistently been rejected. *See, e.g., Larson v. General Motors Corp.*, 391 F.2d 495, 506 (8th Cir. 1968) (Safety Act "not an exemption from common law liability."); *See also, Cryts v. Toyota*, 571 S.W.2d 683, 689 (Mo.App. 1978) ("compliance with minimal federal standards does not mitigate a manufacturer's responsibility under the theory of strict liability… ."). These cases accurately reflect the intent of Congress that the FMVSS were never to serve as a shield, in any form, from liability for common law product liability claims.

Evidence of compliance with a minimum governmental standard to rebut Plaintiff's evidence of the subject vehicle being defective or unreasonably dangerous is irrelevant and if permitted would inject potential error into the case.

Additionally, all cars that are sold have to comply with the FMVSSs.  Clearly, there have been defective cars placed into the stream of commerce.  Take for instance the Ford Pinto.  It

passed the applicable FMVSSs and it turned out to be highly dangerous. All manufacturers have issued recalls on their vehicles that complied with FMVSS when they were sold. Merely complying with these standards doesn't relieve a manufacturer of its obligation to make a safe car.

For all the foregoing reasons, Plaintiff respectfully requests an order *in limine* precluding Defendant Toyota from presenting any evidence or testimony regarding alleged compliance with the Federal Motor Vehicle Safety Standards.

**Granted _____**          **Denied _____**

### 9.    Motion To Exclude Exponents Airbag Tests

Defendants have designated Karen Balavich to provide expert testimony regarding air bag design, testing, and performance.  One of the opinions offered by Ms. Balavich is that the separation in the subject vehicle's CSA (curtain shield airbag) was created by over-pressurization.  This over-pressurization was allegedly due to deformation of the roof rail causing the CSA to become trapped and inhibiting the CSA from expanding to its full volume.

It should be noted at the outset that Ms. Balavich has never seen or inspected the subject vehicle.  In fact, she had to rely on Mike Klima, another expert, to explain the views she was seeing in the photographs she was reviewing. (Balavich Dep. 109, Ex.A)

Ms. Balavich will attempt to rely upon "a deployment study" conducted by Exponent that does not represent the circumstances of the subject rollover crash nor does it involve the portion of the bag that failed in the subject accident, nor was the test conducted under remotely similar conditions.

Ms. Balavich is of the opinion that the roof rail above the B-pillar and the B-pillar itself deformed inward and downward pressing against the driver's seat headrest thereby impinging the deployment of the airbag before the sensor fired to deploy the airbag.  The timing and sequence of the roof deformation and the sensor firing the airbag are critical in this analysis.  As an example, if the airbag fired before the roof deformation occurred, then a properly working non-defective bag should have fully deployed as there would have been nothing to impinge it.

Despite recognizing the importance of the timing of the airbag deployment, Ms. Balavich did no independent work to determine when the sensor fired the airbag. (Balavich Dep. 109, Ex. A)  Ms. Balavich testified:

> Q.    And do you believe that that impingement/compression occurred before the signal to deploy occurred?

> **A.    I don't know if it's before or after.  It could be during.**
> (Balavich Dep.132:14-16, Ex. A)

Ms. Balavich relies on a deployment study conducted by Exponent for the proposition that the bag in the subject vehicle over-pressurized.  Ms. Balavich relies on this study even though she was not present for the study. (Balavich Dep. 30, Ex. A)  She did not know how the tests were going to be configured and played no role in putting together the test reports after the testing. (Balavich Dep. 39, Ex. A)

The hole in the airbag in the subject vehicle is in the front chamber.  The front chamber is larger than the rear chamber.  During the attempted deployment of the subject bag, gas clearly flowed into the front and rear chambers of the bag.  The rear chamber inflated covering most of the rear window.   The front chamber is where Ms. Balavich claims the over-pressurization occurred.  (Balavich Dep. 144, Ex. A)

 Despite knowing gas flowed to both chambers and despite knowing the hole in the subject bag was in the front chamber, Exponent rigged the test to insure that no gas could flow to the front chamber and that all gas was forced into the smaller rear chamber. (Balavich Dep. 34, 36, Ex. A) Exponent accomplished this by placing a series of two-inch steel tubes around the airbag to prevent its deployment. (Balavich Dep. 18, 36, Ex. A)



As previously mentioned, Ms. Balavich claims the subject bag was impinged at the B-pillar roof rail and the seat headrest. (Balavich Dep. 109, Ex. A)  The seat headrest is only about four or five inches wide and is covered in foam padding.  (Balavich Dep. 143-144, Ex 10, Ex. A)  Mike Klima, who actually inspected the vehicle, testified this was the only area of impingement he could document post-crash.  (Klima Dep. 92, Ex. B)  Ms. Balavich  acknowledged that nobody at Exponent tried to impinge the area of the bag that she and Mr. Klima believe was impinged by the headrest to see what affect that would have on over-pressurization.  (Balavich Dep. 144, 148, Ex. A)



**Area Balavich was told where the headreast impinged the airbag**

(Balavich Dep. Ex. 10)

There were three tests conducted. During the first two tests, the bag ruptured where the inflator inserts into the bag, a condition that does not exist in the subject bag. Then, after adjusting the steel tubes and inflating the bag for a third time, Exponent "got what they wanted". (Balavich Dep. 34, Ex. A) They were finally able to over-pressurize the bag. However, after multiple attempts, the bag still ruptured around the inflator, a condition not present in the subject bag.

These tests will confuse and mislead the jury. They are not remotely similar to the conditions as they existed in the subject vehicle and should be excluded from this case.

**Granted _____          Denied _____**

**10.    Motion To Exclude Or Prevent Karen Balavich From Offering An Opinion Based Upon Her "Belief"**

One of Plaintiff's claims in this case is a manufacturing defect.  Plaintiff, through her expert, Richard Edwards, claims the hole in the front chamber of the bag, was a pre-existing condition which occurred during the manufacturing process in Thailand and was not caught by inspections.

Ms. Balavich claims that Mr. Edward's opinion of a manufacturing defect is unsupported. Her stated support for this claim is that she did not "believe" they (Toyota Gosei North America) would miss a tear or hole in a bag during their inspection processes.  (Balavich Dep. 157, 158, Ex. A)  Ms. Balavich makes this claim even though she has no specific independent knowledge of the inspection process. Despite the fact that TGNA contemplates that bags could be torn, scorched, or damaged during the manufacturing process, it is Mr. Balavich's "belief" that TGNA would not miss this during the inspection process.  (Balavich Dep. 158, Ex. A)

This type of opinion will not assist the trier of fact and is not based on any reliable information.  It should be excluded.

**Granted _____        Denied _____**

**11.    Motion to Exclude Defendant's Expert's Gratzinger And Van Arsdell From This Case**

Defendants disclosed William Van Arsdell and Robert Gratzinger as expert witnesses in this case.  Mr. Gratzinger was disclosed as an expert on roof structure.  Mr. Van Arsdell was disclosed as an expert on seatbelts.  The Toyota Defendants filed a Motion for Partial Summary Judgment on Plaintiff's claims of a defective roof and defective seatbelts.  This Court granted Defendants' motions on these claims. (Doc 116)  As a result, Mr. Gratzinger and Mr. Van Arsdell's testimony is no longer relevant to the claims in this case.  Allowing them to testify would only serve to confuse the jury, would be redundant and would extend the length of the trial. Therefore they should be precluded from testifying at trial.

**Granted _____**          **Denied _____**

**12.    Motion To Exclude Statements Or Evidence That The Lawyer's Experts, Witnesses Or Their Families "Drive And/Or Own Camrys Or Toyota Products."**

Whether Toyota's experts, counsel, employees, or their families drive or own a Camry (or any other Toyota Product) is entirely irrelevant to the sole issue presented here – whether April Quinton's vehicle is defective. Such statements personally vouching for the Camry is calculated to convey the message that the Camry must be safe, since Toyota's lawyers, engineers, and experts, and their families are willing to drive them. However, the personal choice of these individuals is irrelevant to any material issue, will mislead the jury, and result in a waste of time. Moreover, such statements are unfairly prejudicial and unreliable to the extent that Plaintiff cannot depose Toyota counsel, or the wives and children of experts and employees to determine whether they, in fact, drive Camrys or Toyotas, the reasons they drive these vehicles, and any problems they may have had with them.

**Granted _____         Denied _____**

**13.     Motion to Exclude Any Testimony Or Evidence Relating To April Quinton's Driving Record And Any Previous Accidents.**

Plaintiff anticipates that Defendant's will attempt to introduce Plaintiff's driving record including any past citations or claims that she was at fault in any previous accidents.  This evidence is irrelevant, immaterial and highly prejudicial.  Accordingly, the Court should prevent Defendant's and their counsel from mentioning, inferring or alluding to any previous accidents or citations received by April Quinton before the accident made the subject of this case.


**Granted _____           Denied _____**

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully submits that said Motions in Limine are due to be granted.

Respectfully Submitted,

THE CLARDY LAW FIRM

s/B. Allen Clardy, Jr.
B. Allen Clardy, Jr. (Federal ID No. 6515)
1001 E. Washington St.
Greenville, SC 29601
Telephone: (864) 233-8888
Facsimile: (864) 233-8889
E-mail: Allen@theclardylawfrrm.com

J. Cole Portis
R. Graham Esdale, Jr.
Beasley Allen, Crow, Methvin, Portis & Miles, PC
Post Office Box 4160
Montgomery, AL 36103-4160
Telephone: (334) 269-2343
Facsimile: (334) 954-7555
E-mail: Cole.Portis@beasleyallen.com
Graham.Esdale@beasleyallen.com

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true and correct copy of the foregoing document was filed electronically with the Clerk of the Court for the U.S. District Court, District of Federal, using the electronic case filing system of the court. The electronic case filing system sent "Notice of Electronic Filing" to all attorneys of record listed below on this 15th day of May, 2013.

Joel H. Smith
Angela G. Strickland
Richard H. Willis
Bowman & Brooke, LLP
1441 Main Street, Suite 1000
Columbia, SC 29201
(803) 726-0200

Bard D. Borkon
Bowman and Brooke, LLP
150 South Fifth Street, Suite 3000
Minneapolis, MN 55402
(612) 672-3241

**Attorneys for Defendant**
**Toyota Motor Corporation;**
**Toyota Motor Sales, U.S.A., Inc.;**
**Toyota Motor Engineering and**
**Manufacturing North America, Inc.;**
**Toyoda Gosei North America Corp.**

s/B. Allen Clardy, Jr.
B. Allen Clardy, Jr. (Federal ID No. 6515)